Per Curiam :
This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 57 (a). The commissioner has done so in an opinion and report filed on February 16,1968. Plaintiff has filed no exceptions or brief on this report and the time for so filing pursuant to the rules of the court has expired. On March 26, 1968, defendant filed a motion for adoption of the commissioner’s report. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $70.00.
OPINION OE COMMISSIONER
Bennett, Chief Commissioner: The petition in this case asserts two causes of action. First, plaintiff has claimed that he is entitled to $61,568.40, representing interest at 6 percent on $140,000 for just over 7 years (September 1957-December 1964), during which time defendant’s publicity that it was *300 considering building the proposed Willow Island Locks and Dam on the Ohio River where his farm is located in Pleasants County, West Virginia, tied up his land so that an option he had given the Monongahela Power Company on July 10, 1957, for purchase at $140,000 was never exercised. As the facts developed at the trial prove, this was not the actual reason the option was not exercised but it may have militated against his sale of this farmland for industrial use to others. However, at the close of plaintiff’s case-in-chief, defendant’s motion to dismiss this part of the claim, pursuant to Rule 67(c), was granted because a threat of a taking is not a taking. Hempstead Warehouse Corp. v. United States, 120 Ct. Cl. 291, 306, 98 F. Supp. 572, 573 (1951). In his brief and requested findings, plaintiff has now waived this part of his claim.
The second cause of action is for alleged physical damage to plaintiff’s property in the sum of $5,000. This damage is alleged to have been suffered by the presence of defendant’s personnel and equipment on his land for surveying and core drilling, pursuant to right-of-entry permits granted defendant by plaintiff. The facts with respect to this remaining issue are set forth in the findings and thereunder plaintiff is entitled to nominal damages of $70.
FINDINGS oi? Fact
1. The United States Army Engineer District, Corps of Engineers, Huntington, West Virginia, in connection with the responsibility placed upon the Secretary of the Army in section 6, as amended, of the Rivers and Harbors Act of March 3,1909, 35 Stat. 815, to improve and maintain navigation facilities on the Ohio River, determined to make extensive studies for the replacement of certain locks and dams. Several sites considered included one located at mile 162.4 below Pittsburgh for the Willow Island Locks and Dam to replace existing structures 15, 16 and 17.
2. In order to determine the suitability of the subsurface conditions for the proposed structure, it was necessary to core drill at the proposed sites. The site at mile 162.4 was initially *301 the favored site and was at the location of plaintiff Carroll Elliott’s farm on the West Virginia side of the river in Pleasants County.
3. On November 23, 1959, plaintiff gave defendant, by execution of a form supplied by defendant, a right-of-entry for survey and exploration for a period of 12 months. The stated purpose was for ingress and egress in order to survey, make test borings, and carry out such other exploratory work as necessary to complete the investigation required. The permit stated, in part:
4.The Government agrees to be responsible for damages arising from the activity of the Government, its officers, agents, employees, or representatives on said land, in the exercise of rights under this permit or right-of-entry, either by repairing such damage or by making a cash settlement with the Owner in lieu thereof.
4. A second and similar right-of-entry for a 24-month period was given to defendant by plaintiff on August 26, 1964. However, on December 24,1964, this right-of-entry was terminated by defendant, at plaintiff’s request, after it had determined that another site at mile 161.7 would be better suited for its purposes.
5. Defendant also obtained a right-of-entry permit from plaintiff’s adjacent neighbor, Elmer J. Bumgardner. On December 15,1959, a survey team of four men from the District Office, Coi’ps of Engineers, went to stake out the location for core hole C59-3 on the Bumgardner land and hole C59-4 on plaintiff’s land. The party proceeded by truck so far as possible on the road and then got out and walked to site C59-3. Elevations were taken and the site for drilling was marked with stakes for the information of the drillers. When the Bumgardner site was so identified, the survey party made its way on foot down the river bank to plaintiff’s property and staked hole C59-4.
6. Immediately thereafter in December 1959, core hole C59-3 was drilled on the Bumgardner land, very near the river. When this work had been completed, the drillers moved their equipment in two trucks along the river bank on plaintiff’s property for 1,170 feet and drilled core hole C59-4 *302 on plaintiff’s land, also near the river. Actual drilling on plaintiff’s property commenced December 17, 1959, and was completed on December 21, 1959. The holes drilled were marked with stakes. The holes were about 5 inches in diameter.
7. At the time of the surveying and drilling in December 1959 the crops had been harvested. The ground was sometimes frozen but muddy when thawed. If any damage was done to plaintiff’s land by the surveying or drilling parties, he made no claim for it at the time.
8. In September 1964 two additional core holes, numbered D8N9 and C6T-51, were staked on plaintiff’s property pursuant to the second entry permit of August 26,1964. As with the first surveying party, this second party proceeded from the Bumgardner property to plaintiff’s property on foot. Corn was being harvested on plaintiff’s land at the time, and there is no proof of any damage to it by this surveying party. The core holes staked in September 1964 were never drilled because of defendant’s decision to locate its project elsewhere.
9. Only one core hole was drilled on the Bumgardner land, as on plaintiff’s. The Bumgardner testimony was that no harm was done to the crops as they had already 'been harvested in December 1959 when the surveying and drilling was done. However, Mr. Bumgardner sought the sum of $50 for movement of the drilling equipment through his property, and defendant paid him that sum.

Damages

10. On December 29,1964, when the right-of-entry permit given to defendant on August 26 of that year was returned to plaintiff, pursuant to plaintiff’s request, he was asked by letter to adiase whether or not any damage was done to his property as a result of work performed under the entry permit. Defendant offered to send a representative to make an investigation if plaintiff replied in the affirmative. Plaintiff did not reply to this letter.
11. On January 18,1965, defendant’s project manager advised plaintiff by letter that since he had made no reply to *303 the inquiry of December 29, 1964, defendant would assume there had been no damage and would close its file.
12. On March 29,1965, plaintiff and his counsel met with representatives of the Corps of Engineers seeking information as to proper procedure for submission of a claim. No formal claim was then submitted. Alleged damages were discussed. Plaintiff at that time felt that physical damage to his property, if any, was minimal.
13. On March 31, 1965, plaintiff’s counsel addressed a letter to the U.S. Army Engineer District, Corps of Engineers, at Huntington, and asserted therein a claim for $140,000. Plaintiff said that a sale of his property for this sum had been prevented by the publicity of defendant’s consideration of plaintiff’s property as the location of the Willow Island project. It was stated in the letter that plaintiff had granted an option for sale at $140,000 but that the prospective buyer was told of the proposed project by the Corps of Engineers and that it was also made public at a hearing on April 12, 1960, at Marietta, Ohio. No mention was made in this claim of any physical damage to plaintiff’s property.
14. On May 27, 1965, plaintiff submitted to defendant, through counsel, a restatement of this claim both by letter and on a damage claim form supplied by defendant. No mention was made therein of any physical damage to the property. The amount of the claim again asserted was in the sum of $140,000. The instructions on the claim form provided in pertinent part:
(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.
(cj In support of claims for damage to property which is not economically reparable, or if the property is lost or destroyed, the claimant should submit statements * * * of * * * the value of the property, both before and after * * *. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, * * *.
*304 Plaintiff did not comply with these instructions.
15. On December 14, 1965, plaintiff’s counsel was advised by counsel for defendant that the claim could not be entertained administratively and that he would have to seek relief by suit in court. This suit was thereafter filed on February 23,1966.
16. Plaintiff produced no books or records to substantiate the damages claimed. His case rests upon his uncorroborated oral testimony that damage was suffered by reason of (a) two trucks with drilling equipment being driven along his property for a distance of 1,170 feet through mud from the Bumgardner core hole C59-3 to hole C59-4 in December 1959; (b) the loss of the use of land for two rows of com, each 1,170 feet long, and the loss of the use of land by reason of having to plow around the stake in core hole C59-4 and around other stakes; (c) the loss of corn which was tramped down by the surveying party in September 1964 and by other surveying parties engaged in continuing trespass from 1959 through 1965; and (d) the loss of trees. Plaintiff seeks $5,000 in breach of contract for this damage allegedly due under terms of the right-of-entry permit.
17. Whatever the condition of plaintiff’s ground at the time the drilling equipment was moved across it, plaintiff admitted in his testimony at the trial that his efforts to level the ruts created by the equipment were confined to using a disc twice over the area and that not over $1 was expended for gasoline and $4 for labor (his own) for this purpose. Further, plaintiff admitted that this damage was probably not as much as suffered by his neighbor, Bumgardner, who accepted $50 in compensation therefor. It is found that $50 would be fair and reasonable compensation for this element of damage, pursuant to defendant’s right-of-entry.
18. Plaintiff had a four-row corn planter, 11 feet wide. He could not get the planter between the river bank and the stake in core hole C59-4 without knocking down the stake. This deprived him of two rows of corn each 1,170 feet long separated by a space of 40 inches. There were other stakes unidentified as to number, allegedly placed along the river *305 bank. They also would have been destroyed by plowing between the core hole and the river. Plaintiff considered that he had no right to destroy any of these stakes even after the first right-of-entry permit expired on November 23, 1960, and defendant had no rights on his land thereafter until the second right-of-entry was granted to defendant on August 26,1964. Plaintiff did not remove the stakes until authorized to do so by a letter from defendant dated December 24,1964, which was in reply to plaintiff’s request of December 14, 1964, to be relieved of the agreement for right-of-entry because the site of the project had been moved.
It is found that the only stake that interfered with plaintiff’s cultivation of his field was the one in the core hole C59-4 which plaintiff plowed around, leaving an area of approximately 10 by 20 feet in making the turn.
19. Plaintiff estimates that for 5 years he lost the two rows of corn, each 1,170 feet long and 40 inches apart, and approximately 200 square feet of cultivated land around the core hole in order to miss the stake when plowing or harvesting. He estimated that during this time he was realizing a net profit of about $40 per acre of corn and that the area of land lost to cultivation would not exceed 1 acre. The land lost to production, based on plaintiff’s evidence, did not exceed 4,100 square feet out of the 43,560 square feet in an acre of land. Viewing the problem in the light most favorable to plaintiff and assuming that he should not have removed the stake from the core hole even during the interval when defendant had no right-of-entry (November 23, 1960-August 26, 1964) and that he lost 10 percent of his estimated net profit per acre for 5 years, his damages would be nominal and would not exceed $20. Except for this loss, defendant’s activities did not interfere with plaintiff’s operation of his property as a farm. Defendant did not destroy any crops in proceeding to or going from the drilling of core hole C59-4.
20. There was no credible, substantial, or measurable evidence of physical damages suffered by plaintiff on account of the actions of the surveying party in September 1964 or from trespass or from loss of trees.
*306 CONCLUSION 03? LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States and judgment is therefore entered for plaintiff in the amount of seventy dollars ($70).